# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 14, 2005          Decided August 5, 2005

No. 04-5266

ODILLA MUTAKA MWANI, ET AL.,
APPELLANTS

v.

OSAMA BIN LADEN AND
AFGHANISTAN, A FOREIGN STATE,
APPELLEES

———

Appeal from the United States District Court
(USDC) for the District of Columbia
(No. 99cv00125)

———

*Philip M. Musolino* argued the cause and filed the briefs for appellants.

*R. Michael Smith* argued the cause and filed the brief for appellee. *Carolyn M. Welshhans* entered an appearance.

Before: EDWARDS, TATEL, and GARLAND, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: On August 7, 1998, a devastating truck bomb exploded outside the American embassy in Nairobi, Kenya. The blast killed more than 200 people, including 12 Americans, and wounded more than 4000 others. Most of the casualties were Kenyan. The plaintiffs in this case are all Kenyan: victims, relatives of victims, and businesses harmed in the attack. They sued defendants Osama bin Laden and al Qaeda for orchestrating the bombing, and defendant Afghanistan for providing logistical support to bin Laden and al Qaeda. The district court dismissed the claims against Afghanistan for lack of subject matter jurisdiction, and those against bin Laden and al Qaeda for lack of personal jurisdiction.

Although we agree that the Foreign Sovereign Immunities Act bars the plaintiffs' claims against Afghanistan, we reverse the dismissal of their actions against bin Laden and al Qaeda. Those defendants "engaged in unabashedly malignant actions directed at [and] felt" in this country. *GTE New Media Servs., Inc v. Bellsouth Corp*, 199 F.3d 1343, 1349 (D.C. Cir. 2000). Bin Laden and al Qaeda should therefore "reasonably anticipate being haled into court" here by those injured as a result of those actions, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473-74 (1985), regardless of the plaintiffs' nationality.

I

In early 1999, Odilla Mutaka Mwani and his fellow plaintiffs filed this action in the United States District Court for the District of Columbia. They sought compensatory damages and other relief from Osama bin Laden, the terrorist organization known as al Qaeda, and the nation of Afghanistan for the injuries they sustained in the embassy bombing.[1] The plaintiffs

---

[1]The plaintiffs also named the United States and Sudan as defendants. The district court dismissed those claims, and the

predicated subject matter jurisdiction for their claims against Afghanistan on the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 *et seq.*, and for those against bin Laden and al Qaeda on the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350.  The latter provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  *Id.*

On February 12, 1999, the plaintiffs moved to serve defendants bin Laden and al Qaeda by publication.  On August 2, 1999, the district court granted the plaintiffs leave to serve those defendants by "publishing. . . notice for six weeks in the Daily Washington Law Reporter, the International Herald Tribune, and Al-Quds Al-Arabi (in Arabic)."  *Mwani v. United States*, No. 99-125, Order at 4 (D.D.C. Aug. 2, 1999) ("August 1999 Order").  The plaintiffs later advised the court that the notice had run in all three newspapers, as well as in two additional East African publications.

To no one's surprise, neither bin Laden nor al Qaeda responded.  On August 11, 2000, the plaintiffs moved for entry of default against them.  Because the district court was not satisfied that it had personal jurisdiction over bin Laden and al Qaeda, it denied the motion without prejudice, granting plaintiffs additional time to pursue the issue.  *See Mwani v. United States*, No. 99-125, Mem. Op. at 2-3, 5 (D.D.C. Mar. 15, 2001) ("March 2001 Opinion").  The plaintiffs responded with a renewed motion for entry of default in July 2001, and with supplemental memoranda in August, September, and October of that year.  In these papers, the plaintiffs argued that bin Laden and al Qaeda had sufficient nationwide contacts with the United States to satisfy constitutional limits on the court's exercise of

---

plaintiffs have not appealed.

jurisdiction.[2]

On September 30, 2002, the district court held that, to enter a default, it "must have jurisdiction over the party against whom the judgment is sought," and the plaintiffs must demonstrate such jurisdiction by a preponderance of the evidence. *Mwani v. United States*, No. 99-125, Mem. Op. at 2 (D.D.C. Sept. 30, 2002) ("September 2002 Opinion") (internal quotation marks omitted). Applying those principles, the court concluded that the plaintiffs had "failed to sustain their burden of proving that this Court can exercise personal jurisdiction over" bin Laden and al Qaeda. *Id.* That was so, the court said, both because of the quality of the plaintiffs' evidence, and because of its failure to establish sufficient contacts between the defendants and the forum to permit the exercise of jurisdiction under the District of Columbia's long-arm statute and the U.S. Constitution. *See id*. at 9-11.

The dismissal of the plaintiffs' claims against bin Laden and al Qaeda left Afghanistan as the only remaining defendant. The plaintiffs effected service of process by certified mail on Afghanistan's Ministry of Foreign Affairs, through that country's embassy in the District of Columbia. An appearance was entered by the Transitional Islamic State of Afghanistan (hereinafter Afghanistan) -- "the interim government for Afghanistan established by the Bonn Accords of December

---

[2]The plaintiffs offered two additional bases for personal jurisdiction, one grounded in the concept of "universal jurisdiction" and the other in the "effects doctrine." Pls.' Renewed Mot. for Entry of Default at 19, 21 (July 16, 2001). The district court rejected both, as well as the contention that the defendants' nationwide contacts were sufficient to permit the exercise of jurisdiction. Because we conclude that the nationwide contacts were in fact sufficient, we do not address the plaintiffs' additional bases.

2002, which were implemented under the United Nations' auspices after the Taliban's armed forces were defeated by an international coalition and the Northern Alliance." Appellees Br. at 4. Afghanistan then moved to dismiss the plaintiffs' claims for lack of personal and subject matter jurisdiction, citing the FSIA.

In June 2004, the district court granted Afghanistan's motion to dismiss, rejecting the plaintiffs' contention that the case fell within two exceptions to the FSIA -- for implicit waiver and commercial activities. *Mwani v. United States*, No. 99-125, Mem. Op. at 12 (D.D.C. June 22, 2004) ("June 2004 Opinion"). At the same time, it denied the plaintiffs' request for jurisdictional discovery because it did "'not see what facts additional discovery could produce that would affect [its] jurisdictional analysis.'" *Id.* at 11 (quoting *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C. Cir. 1994)).

The plaintiffs filed a timely appeal. In Part II, we consider their contention that the district court erred in dismissing the claims against bin Laden and al Qaeda. In Part III, we address their challenge to the dismissal of the claims against Afghanistan.

II

We review the dismissal of a claim for lack of jurisdiction de novo. *See, e.g.*, *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C. Cir. 2002). In evaluating the district court's dismissal of the claims against bin Laden and al Qaeda, we must consider two distinct determinations made by the court. The first is the appropriate burden and standard of proof for establishing personal jurisdiction over an absent defendant at this stage of the litigation. The second is whether the plaintiffs satisfied those requirements.

6

A

The district court correctly noted that the entry of a default judgment[3] is not automatic, and that a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant. March 2001 Opinion at 2.[4] The court acknowledged that when ruling upon personal jurisdiction without an evidentiary hearing, a court ordinarily demands only a prima facie showing of jurisdiction by the plaintiffs. September 2002 Opinion at 6.[5] It is only if the court takes evidence on the issue or rules on the personal jurisdiction question in the context of a trial that a heightened, preponderance of the evidence standard applies. *Id.*[6] Nonetheless, the district court concluded that in this case it

---

[3]The district court intentionally collapsed the two stages of default, treating the plaintiffs' motion for entry of default by the clerk, *see* FED. R. CIV. P. 55(a), as a motion for entry of a default judgment by the court, *see id.* 55(b)(2). *See* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE §§ 2682, 2685 (3d ed. 1998) (hereinafter WRIGHT & MILLER).

[4]*See Dennis Garberg & Assocs. v. Pack-Tech Int'l Corp.*, 115 F.3d 767, 772 (10th Cir. 1997) ("[A] district court must determine whether it has jurisdiction over the defendant before entering judgment by default against a party who has not appeared in the case."); 10A WRIGHT & MILLER § 2682, at 14.

[5]*See Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991); *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378-791 (D.C. Cir. 1988); *Dennis Garberg & Assocs.*, 115 F.3d at 773; 2 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 12.31[5] (3d ed. 2002) (hereinafter MOORE'S).

[6]*See Dennis Garberg & Assocs.*, 115 F.3d at 773; MOORE'S § 12.31[5].

should require the plaintiffs to establish jurisdiction by a preponderance of the evidence, because it was "on the cusp of a default judgment proceeding . . . , and . . . Defendants are not presently before the Court." September 2002 Opinion at 6. And it further determined that, to satisfy that burden, the plaintiffs would have to proffer evidence meeting the standards of admissibility ordinarily reserved for the summary judgment and trial stages of litigation. *See id.* at 12-14.

We reject this approach. The absence of the defendant is precisely the reason the Federal Rules of Civil Procedure provide for default judgments, which safeguard plaintiffs "when the adversary process has been halted because of an essentially unresponsive party. In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (internal quotation marks omitted). Far from constituting a rationale for increasing the plaintiffs' burden of proof, if anything the absence of the defendants counsels greater flexibility toward the plaintiffs because it impedes their ability to obtain jurisdictional discovery. There is thus no reason for the district court to insist upon an evidentiary hearing, and it did not do so in this case.

In the absence of an evidentiary hearing, although the plaintiffs retain "the burden of proving personal jurisdiction, [they] can satisfy that burden with a *prima facie* showing." *Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991) (citation omitted). Moreover, to establish a prima facie case, plaintiffs are not limited to evidence that meets the standards of admissibility required by the district court. Rather, they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they

can otherwise obtain.[7]

Adherence to these principles does not unduly disadvantage those absent defendants who truly are beyond the power of the court.  Entry of a default judgment is not the court's final say on a matter.  Rule 55(c) provides that "[f]or good cause shown the court may set aside . . . a judgment by default . . . in accordance with Rule 60(b)."  FED. R. CIV. P. 55(c).  Under the rule, a defendant can successfully challenge a default judgment in the rendering court on the ground of lack of personal jurisdiction. *See, e.g.*, *Combs v. Nick Garin Trucking*, 825 F.2d 437, 438 (D.C. Cir. 1987).  And a defendant is "always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982); *see* 10 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE §§ 55.50[2][b][i] (3d ed. 2005).

B

Having set forth the appropriate burden and standard of proof, we now consider whether the plaintiffs have satisfactorily shown that the district court may exercise personal jurisdiction over bin Laden and al Qaeda.  In the first section below, we address the sources of authority for such an exercise.  In the second section, we consider whether the exercise of that jurisdiction would contravene constitutional due process.

---

[7] *See, e.g.*, *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787-88 (D.C. Cir. 1983); *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1119 (9th Cir. 2002); *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).

1

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). The district court did not dispute that the plaintiffs had accomplished service by an acceptable method. Rule 4 of the Federal Rules sets forth the various methods by which a summons may be served in federal court proceedings, and Rule 4(f) specifically addresses "[s]ervice upon individuals in a foreign country." It provides, in relevant part:

> Unless otherwise provided by federal law, service upon an individual from whom a waiver has not been obtained and filed . . . may be effected in a place not within any judicial district of the United States . . . by . . . means not prohibited by international agreement *as may be directed by the court*.

FED. R. CIV. P. 4(f)(3) (emphasis added).

Here, the district court authorized the plaintiffs to serve bin Laden and al Qaeda by publication. The court observed that their "address is not known, nor is it easily ascertainable," August 1999 Order at 3, and that bin Laden had published at least one *fatwa* in *Al-Quds Al-Arabi*, *id.* at 4. It concluded that publication was "reasonably calculated to apprise [bin Laden and al Qaeda] of the lawsuit and afford them an opportunity to present their objections." *Id.* In *Mullane v. Central Hanover Bank & Trust Co.*, the Supreme Court sanctioned service by publication "where it is not reasonably possible or practicable to give more adequate warning," holding that, "in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the

situation permits and creates no constitutional bar to a final decree foreclosing their rights." 339 U.S. 306, 317 (1950).

The district court correctly recognized, however, that service of process does not alone establish personal jurisdiction. As the Supreme Court said in *Omni Capital*, "[b]efore a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant." 484 U.S. at 104. There also must be "authorization for service of summons on the defendant," and a "constitutionally sufficient relationship between the defendant and the forum." *Id.*; *see id.* at 103 n.6 (noting the distinction between an "objection to the method of service" and an objection "to amenability to service"). To determine whether these requirements were satisfied here, the district court undertook a traditional inquiry. It asked first whether there was an applicable long-arm statute that would authorize service on the defendants, and then whether the application of such a statute would comply with the demands of due process. *See, e.g.*, *GTE*, 199 F.3d at 1347; *Jungquist v. Sheikh Sultan bin Khalifa Al Nahyan*, 115 F.3d 1020, 1030-31 (D.C. Cir. 1997).

With respect to the availability of a long-arm statute, the district court said that, "[b]ecause there is no federal equivalent, District of Columbia law provides the long-arm statute applicable in this case." September 2002 Order at 3-4. Citing one of our precedents, the court declared that the District's long-arm statute "is as far-reaching as due process allows, meaning that only minimum contacts with the District are necessary to sustain jurisdiction here." *Id.* at 4 (quoting *Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1089 (D.C. Cir. 1998)). While it is true that some provisions of the District's long-arm statute reach as far as due

process permits,[8] the only provision applicable here does not. That provision is D.C. Code § 13-423(a)(4), which provides that

> [a] District of Columbia court may exercise personal jurisdiction over a person . . . as to a claim for relief arising from the person's -- . . . causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia *if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.*

D.C. CODE § 13-423(a)(4) (emphasis added). It is unlikely that the defendants would be susceptible to jurisdiction under that provision, as no evidence was proffered that meets the italicized prerequisites. But it is also clear that the Due Process Clause does not demand the level of contacts required by that provision, and hence that the provision does not extend as far as the Clause. Indeed, as the District of Columbia Court of Appeals has said, in "contrast to § 13-423(a)(1), which we have held to be coextensive with the Constitution's due process limit, 'the drafters of [§ 13-423(a)(4)] apparently intended that [this] subsection would not occupy all of the constitutionally available

---

[8]The plaintiffs in *Caribbean Broadcasting* sought to predicate jurisdiction on the sale of advertising, which falls under the "transacting any business" provision of the statute, D.C. CODE § 13-423(a)(1). That provision states that a District of Columbia "court may exercise personal jurisdiction over a person . . . as to a claim for relief arising from the person's . . . transacting any business in the District of Columbia." *Id.* The District courts have, in fact, concluded that "the transacting any business provision is coextensive with the due process clause." *Hummel v. Koehler*, 458 A.2d 1187, 1190 (D.C. 1983) (internal quotation marks omitted).

space.'" *Parsons v. Mains*, 580 A.2d 1329, 1331 (D.C. 1990) (quoting *Carr v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987)) (alterations in original).

Prior to 1993, the absence of a state long-arm statute reaching the defendants' activity would have denied the district court personal jurisdiction, since the federal cause of action at issue here -- the ATCA -- contains no long-arm provision of its own. As the Supreme Court explained in its 1987 decision in *Omni Capital*, at that time the Federal Rules generally authorized service beyond the territorial limits of the state in which the district court was situated only when service was authorized by "a federal statute or . . . the long-arm statute of [that] State." *Omni Capital*, 484 U.S. at 105 (citing then-FED. R. CIV. P. 4(e)). Indeed, the problem the plaintiffs faced in *Omni Capital* was identical to that faced by the plaintiffs here. Like the ATCA, the statute providing their federal cause of action (a provision of the Commodity Exchange Act) did not authorize service on the foreign defendants. And like the District of Columbia's long-arm statute, the applicable state long-arm did not reach the *Omni Capital* defendants because it was limited to a defendant who "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered" in the state. *Id.* at 108 (quoting LA. REV. STAT. ANN. § 13:3201(d)). Thus, the Federal Rules did not authorize service of process on the defendants. *See id.*

In *Omni Capital*, the Supreme Court rejected a suggestion by the dissenters in the court below that it should "remed[y] this 'bizarre hiatus in the Rules' with an ad hoc authorization of service of process on [the defendants] based on their contacts with the United States as a whole." *Id.* at 102 (quoting *Point Landing, Inc. v. Omni Capital International, Ltd.*, 795 F.2d 415, 428 (5th Cir. 1986) (en banc) (Wisdom, J., concurring in part

and dissenting in part)).  Nonetheless, the Court was "not blind to the consequences of the inability to serve process on" the foreign defendants, *id.* at 111, and it offered the following suggestion:

> A narrowly tailored service of process provision, authorizing service on an alien in a federal-question case when the alien is not amenable to service under the applicable state long-arm statute, might well serve the ends of [certain] federal statutes.  It is not for the federal courts, however, to create such a rule as a matter of common law.  That responsibility, in our view, better rests with those who propose the Federal Rules of Civil Procedure and with Congress.

*Id.*

Those "who propose the Federal Rules of Civil Procedure" took notice of the Court's suggestion, and a revision was enacted in 1993.  Although no case in this Circuit has yet cited that revision, the Rules now contain their *own* long-arm provision which, in some circumstances, eliminates the need to employ the forum state's long-arm statute.   Rule 4(k)(2) now provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons . . . is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

FED. R. CIV. P. 4(k)(2).[9]  Rule 4(k)(2) thus permits a federal court to exercise personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States.

In the instant case, the claims arise under federal law (the ATCA), and the summons was served by publication pursuant to Rule 4(f).  Whether the exercise of jurisdiction is consistent with the Constitution turns on whether a defendant has sufficient contacts with the nation as a whole to satisfy due process.  *See* FED. R. CIV. P. 4(k) advisory committee's notes to 1993 amendments.  We address that question in Part II.B.2.  The remaining question here is whether bin Laden and al Qaeda are "subject to the jurisdiction of the courts of general jurisdiction of any state."  FED. R. CIV. P. 4(k)(2).

---

[9]The Advisory Committee's Notes for the 1993 amendments to Rule 4 provide the following background regarding paragraph (k)(2):

> This paragraph corrects a gap in the enforcement of federal law.  Under the former rule, a problem was presented when the defendant was a non-resident of the United States having contacts with the United States sufficient to justify the application of United States law . . . , but having insufficient contact with any single state to support jurisdiction under state long-arm legislation or meet the requirements of the Fourteenth Amendment limitation on state court territorial jurisdiction. . . . In this respect, the revision responds to the suggestion of the Supreme Court made in *Omni Capital* . . . .

FED. R. CIV. P. 4(k) advisory committee's notes to 1993 amendments.

Determining whether a defendant is subject to the jurisdiction of a court "of any state" presents no small problem. One could, of course, ponderously "traipse through the 50 states, asking whether each could entertain the suit." *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001). To avoid that daunting task, the Seventh Circuit has adopted the following burden-shifting framework:

> A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed. Naming a more appropriate state would amount to a consent to personal jurisdiction there (personal jurisdiction, unlike federal subject-matter jurisdiction, is waivable). If, however, the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2).

*Id.* We find this resolution eminently sensible, and, like the Fifth Circuit, we adopt the Seventh Circuit's view that "so long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction." *Adams v. Unione Mediterranea di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004).

Needless to say, defendants bin Laden and al Qaeda have not conceded to the jurisdiction of any state. Accordingly, we now move to the final issue under Rule 4(k)(2).[10]

---

[10]Although the plaintiffs did not expressly rely on Rule 4(k)(2), we agree with the Seventh Circuit that "it is best to excuse the forfeiture." *ISI Int'l*, 256 F.3d at 551. "Federal courts are entitled to apply the right body of law, whether the parties name it or not." *Id.* While the plaintiffs did not name Rule 4(k)(2) specifically, they certainly identified the correct body of law, asserting "the availability

2

Whether the exercise of jurisdiction is "consistent with the Constitution" for purposes of Rule 4(k)(2) depends on whether a defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment. *See* FED. R. CIV. P. 4(k) advisory committee's notes to 1993 amendments; *see also Adams*, 364 F.3d at 651; *ISI Int'l*, 256 F.3d at 551. The Clause "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations,'" *Burger King*, 471 U.S. at 472 (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 319 (1945)), and "requir[es] that individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign,'" *id.* (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977)) (second alteration in original). "Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum," *id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)), "and the litigation results from alleged injuries that 'arise out of or relate to' those activities," *id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

In reaching the conclusion that it lacked personal jurisdiction over bin Laden and al Qaeda, the district court

of national contacts personal jurisdiction . . . under F.R. Civ. P. 4," and citing the section of a treatise discussing paragraph (k)(2). Appellants Br. at 21 (citing 4 WRIGHT & MILLER § 1068.1); Pls.' Mot. for Recons. at 3 & n.4 (Oct. 11, 2002) (same).

focused on a list of specific, physical contacts that the plaintiffs alleged the defendants had made with the District of Columbia and its environs. Those contacts included: the publication of *fatwas* in a newspaper distributed in the United States; the shipment to Virginia of the power supply for a cell phone that bin Laden used in Afghanistan; the scheduling of a bin Laden interview in Afghanistan through an agent in Washington, D.C.; and the transmission of bin Laden's views to the District via interviews on CNN and ABC. *See* September 2002 Opinion at 28-29. Much of this evidence came from the indictment and closing argument in *United States v. Bin Ladin*, No. 98-CR-1023 (S.D.N.Y.), as well as from government speeches, press releases, and other reports. "All of Plaintiffs' submissions to the Court have various evidentiary problems," the district court said. September 2002 Opinion at 14; *see id.* at 13-14 (concluding that several submissions constituted "inadmissible hearsay"). And those problems aside, the court thought the evidence did not demonstrate "that [bin Laden] and al Qaeda 'purposefully directed' [their] activities at the United States" and "that this litigation *results* from alleged injuries that arise out of or relate to those activities." *Id.* (quoting *Burger King*, 471 U.S. at 472).[11]

As we noted in Part II.A, the district court's emphasis on satisfying strict evidentiary standards at this stage of the litigation was incorrect. While understandable given the absence of Circuit precedent regarding Rule 4(k)(2), so, too, was its exclusive focus on contacts with the District of Columbia,

---

[11]The district court rejected the plaintiffs' subsequent offers of additional evidence in motions for reconsideration, in part because the proffered evidence, even if newly discovered, "would not change the Court's . . . ruling on personal jurisdiction." *Mwani v. United States*, No. 99-125, Mem. Op. at 4 (D.D.C. Sept. 30, 2003) (denying motion for reconsideration).

rather than with the nation as a whole. *See supra* Part II.B.1. But the fundamental problem with the court's analysis was its focus on specific, *physical* contacts between the defendants and the forum. Although "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum," *Burger King*, 471 at 474 (quoting *International Shoe*, 326 U.S. at 316), the "foreseeability" of causing injury in the forum can establish such contacts where "the defendant's conduct and connection with the forum . . . are such that he should reasonably anticipate being haled into court there." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). "Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum." *Id.* at 477. Rather, "[s]o long as [an] actor's efforts are 'purposefully directed' toward residents of another [forum]," the Supreme Court has "consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.* at 476 (quoting *Keeton*, 465 U.S. at 774); *see GTE*, 199 F.3d at 1349 (noting that "jurisdiction may attach if the defendant's conduct is aimed at or has an effect in the forum state" (quoting *Panavision International, LP v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998))).

In this case, there is no doubt that the defendants "engaged in unabashedly malignant actions directed at [and] felt in this forum." *Id.* The plaintiffs' allegations and evidence were that bin Laden and al Qaeda orchestrated the bombing of the American embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States. Nor were the plaintiffs' allegations and evidence of contacts with the United States limited to the Nairobi bombing. The plaintiffs described an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders.

Putting to one side the acts that took place after the embassy bombing (including the attacks on the World Trade Center and the Pentagon on September 11, 2001), the plaintiffs pointed to the 1993 World Trade Center bombing, as well as to the plot to bomb the United Nations, Federal Plaza, and the Lincoln and Holland Tunnels in New York.[12]

The plaintiffs thus amply made a prima facie showing that bin Laden and al Qaeda "'purposefully directed' [their] activities at residents" of the United States, *Burger King*, 471 U.S. at 472 (quoting *Keeton*, 465 U.S. at 774), and that this litigation results from injuries to the plaintiffs "that 'arise out of or relate to' those activities," *id.* (quoting *Helicopteros Nacionales*, 466 U.S.

_____

[12]In addition to the allegations of their complaint and pleadings, the plaintiffs supported their contentions with, inter alia: a February 1998 *fatwa* issued by bin Laden and al Qaeda, calling upon Muslims to kill Americans, military and civilian, "in any country in which it is possible to do it," Pls.' Renewed Mot. for Entry of Default at 5; a similar August 1996 *fatwa*, *see id.* at 3; two television interviews, broadcast in the U.S. in 1997 and 1998, in which bin Laden exhorted his followers to "take the fighting to America," Third Supplemental Filing in Supp. of Pls.' Mot. for Entry of a Default at 2 (Oct. 10, 2001); the indictment and argument in a criminal case brought by the United States regarding the Nairobi attack and the simultaneous bombing of the American embassy in Tanzania, *see United States v. bin Laden*, 98-CR-1023 (S.D.N.Y); President Bush's address to Congress, attributing the September 11, 2001 attacks and the embassy bombings to the same group, *see* Second Supplemental Filing in Supp. of Pls.' Mot. for Entry of Default at Pls.' Ex. 4 (Sept. 27, 2001); and a British government report to the same effect, Third Supplemental Filing at 2. *The 9/11 Commission Report*, cited by the plaintiffs before this court, but issued after the district court's decisions in this case, provides substantial further support for the plaintiffs' allegations. *See* THE 9/11 COMMISSION REPORT: FINAL REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES at 47-71 (2004).

at 414). Bin Laden and al Qaeda therefore had "fair warning" that their activities would "subject [them] to the jurisdiction" of the United States. *Id.* (quoting *Shaffer*, 433 U.S. at 218).

The fact that injured Kenyans, not injured Americans, are the plaintiffs in this case does not deny the court personal jurisdiction over the defendants. *See Calder v. Jones*, 465 U.S. 783, 788 (1984) ("The plaintiff's lack of 'contacts' [with the forum] will not defeat otherwise proper jurisdiction."); *Keeton*, 465 U.S. at 780 ("[The] plaintiff's residence in the forum State is not a separate requirement, and lack of residence will not defeat jurisdiction established on the basis of the defendant's contacts.").[13] The defendants' decision to purposefully direct their terror at the United States, and the fact that the plaintiffs' injuries arose out of one of those terrorist activities, should suffice to cause the defendants to "reasonably anticipate being haled into" an American court. *Burger King*, 471 U.S. at 474 (quoting *World-Wide Volkswagen*, 444 U.S. at 297). Of course, a plaintiff's citizenship may affect whether the court has subject matter jurisdiction or the plaintiff has a cause of action. Here, however, the plaintiffs have sued under the Alien Tort Claims Act, which the Supreme Court has held to supply both subject matter jurisdiction and a cause of action for a narrow set of claims brought by aliens and involving violation of the law of nations. *See Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2754, 2761-62 (2004). The *Mwani* plaintiffs certainly have more than a colorable argument that their claims fall within that narrow

---

[13]*Cf. Keeton*, 465 U.S. at 776 (holding that a state had a significant interest in redressing a libel action brought by nonresident plaintiffs because, inter alia, "[f]alse statements of fact harm both the subject of the falsehood *and* the readers of the statement," and a state "may rightly employ its libel laws to discourage the deception of its citizens").

set.[14]

It is true that even after "it has been decided that a defendant purposefully established minimum contacts within the forum . . . , these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476 (quoting *International Shoe*, 326 U.S. at 320). But "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477. Here, the defendants purposefully directed their activities at forum residents, and the fact that the plaintiffs are Kenyans who were injured in the process is not a consideration that would render the assertion of American jurisdiction incompatible with substantial justice.

In sum, we conclude that there is "authorization for service of summons on the defendant[s]" and a "constitutionally sufficient relationship between the defendant[s] and the forum." *Omni Capital*, 484 U.S. at 104. As a consequence, the district

---

[14]In *Sosa*, the Court determined that the First Congress understood the ATCA to "recognize private causes of action for certain torts in violation of the law of nations," including "violation of safe conducts, infringement of the rights of ambassadors, and piracy." 124 S. Ct. at 2761. It concluded that "courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of [those] 18th-century paradigms." *Id.* at 2761-62. The plaintiffs' contention that bin Laden and al Qaeda attacked the American embassy intending, among other things, to kill American diplomatic personnel inside, would appear to fall well within those paradigms. *See id.* at 2756 (noting that the 18th-century paradigm included "assault against an ambassador").

court "may exercise personal jurisdiction over" them.  *Id.*

### III

We now turn to the plaintiffs' appeal from the dismissal of their claims against the remaining defendant, Afghanistan.  The Foreign Sovereign Immunities Act "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (internal quotation marks omitted).  Under the FSIA, a foreign state is immune from the jurisdiction of American courts unless the case falls within a statutory exception.  28 U.S.C. § 1604; *see id.* §§ 1605-1607.  If no exception applies, the district court lacks subject matter jurisdiction.  *Id.* § 1604.  If an exception does apply, the district court has jurisdiction.  *Id.* § 1330(a); *see Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004); *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 (D.C. Cir. 2002).

In the district court, the plaintiffs relied on two statutory exceptions -- for implicit waiver, 28 U.S.C. § 1605(a)(1), and for commercial activity, 28 U.S.C. § 1605(a)(2).[15]  The plaintiffs

---

[15]The plaintiffs concede that another exception, 28 U.S.C. § 1605(a)(7), is inapplicable to this case.  That provision "vitiates immunity in cases 'in which money damages are sought against a foreign state for personal injury or death that was caused'" by specified acts of terrorism "'or the provision of material support or resources . . . for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.'"  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88 (D.C. Cir. 2002) (quoting 28 U.S.C. § 1605(a)(7)); *see Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1032 (D.C. Cir. 2004).  The provision does not apply, however, unless the defendant foreign state "has been specifically designated by

have abandoned the former on appeal and now rely solely on the latter, the third clause of which provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act," and states that "the commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* § 1603(d).

It is the defendant's burden to prove that a plaintiff's allegations do not fall within the bounds of an FSIA exception. *See Kilburn*, 376 F.3d at 1131. "'If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff.'" *Id.* at 1127 (quoting *Phoenix Consulting, Inc. v.*

---

the State Department as a 'state sponsor of terrorism.'" *Price*, 294 F.3d at 89 (quoting 28 U.S.C. § 1605(a)(7)(A)). The plaintiffs acknowledge that the United States has never so designated Afghanistan, thus rendering § 1605(a)(7) inapplicable here and depriving the district court of jurisdiction even to consider a claim against Afghanistan absent some other exception to sovereign immunity.

*Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)). Although Afghanistan does not expressly concede the truth of the plaintiffs' factual allegations, it argues that even if taken as true, the allegations are insufficient to come within the commercial activity exception. This amounts to a challenge to the legal sufficiency of the allegations, and we must thus "decide *de novo* whether [the alleged jurisdictional] facts are sufficient to divest the foreign sovereign of its immunity." *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004).

The gravamen of the plaintiffs' claim to the commercial activity exception is well-described in their appellate brief:

> Afghanistan had served as a place of refuge for international terrorists since the 1980's. The Taliban actively aided Bin Ladin by assigning him guards for security, permitting him to build and maintain terrorist camps, and refusing to cooperate with efforts by the international community to extradite him. Bin Laden provided approximately $10-$20 million per year to the Taliban in return for safe haven.

Appellants Br. at 27 (citations and internal quotation marks omitted). But the plaintiffs' contention that "[t]his conduct constitutes commercial activity as defined by the FSIA and the case law interpreting it," *id.* at 34, cannot stand in the face of the Supreme Court's precedents, or those of this court.

In *Nelson*, the Supreme Court observed that the FSIA largely codifies the "restrictive" theory of foreign sovereign immunity, and that under that theory a state engages in commercial activity

> where it exercises "only those powers that can also be

exercised by private citizens," as distinct from those "powers peculiar to sovereigns." Put differently, a foreign state engages in commercial activity for purposes of the restrictive theory only where it acts "in the manner of a private player within" the market.

507 U.S. at 360 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)). Moreover, the Court emphasized that "whether a state acts 'in the manner of' a private party is a question of behavior and not motivation." *Id.* (quoting *Weltover*, 504 U.S. at 614). As the Court elaborated:

> [B]ecause the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce."

*Id.* at 360-61 (quoting *Weltover*, 504 U.S. at 614) (citations omitted). In accordance with this standard, the *Nelson* Court rejected an argument that Saudi Arabia's wrongful arrest, imprisonment, and torture of the plaintiff, assertedly used by the government to resolve a commercial dispute with the plaintiff, could qualify a claim for the commercial activity exception. As it explained:

> Exercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce. Such acts as legislation, or the expulsion of an alien, or a denial of justice, cannot be

> performed by an individual acting in his own name. They can be performed only by the state acting as such.

*Id.* at 362 (internal quotation marks and alterations omitted).

This court has reached a similar conclusion in a different setting. In *Cicippio v. Islamic Republic of Iran*, we held that hostage-taking for profit did not fall within the commercial activity exception. *See* 30 F.3d 164, 168 (D.C. Cir. 1994). This was so, we said, because the act giving rise to jurisdiction must itself take place in a commercial context. And kidnapping, we concluded,

> cannot possibly be described as an act typically performed by participants in the market (unless one distorts the notion of a marketplace to include a hostage bazaar). That money was allegedly sought from relatives of the hostages could not make an ordinary kidnapping a commercial act any more than murder by itself would be treated as a commercial activity merely because the killer is paid.

*Id.*

*Nelson* and *Cicippio* foreclose the plaintiffs' argument that the transactions between the Taliban, Afghanistan's former rulers, and al Qaeda, a terrorist organization, qualify as commercial activity. The plaintiffs attempt to characterize Afghanistan's harboring of terrorist camps as the "paradigmatically mercantile" provision of land for money, Appellants Reply Br. at 4, but such reductive logic would transform the retaliatory torture in *Nelson* into "commercial dispute resolution," and the kidnapping in *Cicippio* into an "exchange of goods for cash." The key inquiry in determining whether particular conduct constitutes commercial activity is not

to ask whether its purpose is to obtain money, but rather whether it is "the sort of action by which private parties can engage in commerce." *Nelson*, 507 U.S. at 362. Granting refuge to terrorist training camps is a uniquely sovereign act; it is not the sort of benefit that a commercial landlord can bestow upon a commercial tenant. As the plaintiffs themselves describe, refuge involved both the "assigning [of] guards for security" and the "refus[al] to . . . extradite" bin Laden. Appellants Br. at 27. But the Court made clear in *Nelson* that this "[e]xercise of the powers of police" and of authority over "the expulsion of an alien" cannot "be performed by an individual acting in his own name. They can be performed only by the state acting as such." 507 U.S. at 362 (internal quotation marks omitted).

Finally, we also reject the plaintiffs' contention that the district court abused its discretion by denying them jurisdictional discovery against Afghanistan. Although the plaintiffs are correct that the "Federal Rules of Civil Procedure generally provide for liberal discovery to establish jurisdictional facts," *Goodman Holdings*, 26 F.3d at 1147, "[n]evertheless, the scope of discovery lies within the district court's discretion." *Id.* And when we "do not see what facts additional discovery could produce that would affect our jurisdictional analysis," we must "conclude the district court did not abuse its discretion in dismissing the action when it did." *Id.* That is the situation here, because even assuming that the Taliban engaged in all of the conduct alleged in the complaint, the commercial activity exception would not apply.

IV

We affirm the district court's dismissal of the plaintiffs' claims against Afghanistan for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act. We reverse the dismissal of their claims against bin Laden and al Qaeda,

however, because the plaintiffs have satisfied their burden of showing that the district court can properly exercise personal jurisdiction over those defendants.

*So ordered*.