# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 22, 2021               Decided April 23, 2021

No. 20-7033

MYKOLA IVANENKO, ET AL.,
APPELLANTS

v.

VIKTOR YANUKOVICH, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-00812)

*Kenneth Foard McCallion* argued the cause and filed the briefs for appellants.

*Robert M. Shaw* argued the cause for appellee Government of Ukraine. With him on the brief was *Cynthia A. Gierhart*.

Before: HENDERSON and ROGERS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion of the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Appellants Luxexpress–II Ltd., Luxexpress 2016 Corporation, Alamo Group Inc., and Mykola and Larysa Ivanenko challenge the district court's dismissal of their claims against Ukraine for lack of subject–matter jurisdiction pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* They contend that three exceptions to the FSIA confer jurisdiction: expropriation of property in violation of international law, commercial activity, and waiver. *See id.* § 1605(a)(1)–(3). Because none abrogates Ukraine's sovereign immunity, we affirm.

**I.**

Taking as true the factual allegations in the second amended complaint and the declarations, *see Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 395 (D.C. Cir. 2018), Mykola and Larysa Ivanenko, husband and wife, are Ukrainian nationals, 2d Am. Compl. ¶¶ 20–21. In 1993, they formed Luxexpress–II Ltd., an automobile import business based in Kyiv, Ukraine, which focused primarily on American–made vehicles. *Id.* ¶¶ 22, 73. Pursuant to various ordinances, written approvals, and lease agreements, Luxexpress–II leased "one of the most prestigious and valuable plots of land in Kyiv" on the banks of the Dnieper River. *Id.* ¶ 23; *see id.* ¶¶ 73–75, 77–79. Relying on these agreements, Alamo Group Inc., an American export company based in Atlanta, Georgia, began doing business with Luxexpress–II in 2002. *Id.* ¶¶ 19, 81, 90. It loaned $300,000 to Luxexpress–II and entered into a $5 million contract to supply vehicles and auto parts. *Id.* ¶ 84. In addition, Alamo Group and Luxexpress–II executed a no–cost lease, whereby they agreed to share office space with one another in Atlanta and Kyiv. *Id.* ¶ 86. The venture was "hugely successful," helping Luxexpress–II to become one of Ukraine's leading companies. *Id.* ¶ 82.

In December 2003, the Cabinet Ministers of Ukraine approved the construction of a road and railway bridge across the portion of the Dnieper River that bisects Kyiv. *Id.* ¶ 95. A few months later, the Ministry of Transport and the "State Administration of Railway Transport of Ukraine South–Western Railway" notified Luxexpress–II that its property lay in the project's path and its leases could be terminated. *Id.* ¶ 98. Luxexpress–II repeatedly provided the Ministry of Transport with estimates of the property's value so that it could be acquired at a fair market rate, but negotiations with the Ministry of Transport reached an impasse. *See id.* ¶¶ 100–05. Luxexpress–II filed suit in the Kyiv District Court, which ruled in its favor in 2006. *Id.* ¶ 107. But Ukraine appealed to the Supreme Court of Ukraine, which vacated the judgment. *See id.* ¶¶ 108–16.

Although the issue of compensation remained unresolved, the Cabinet Ministers informed Luxexpress–II in October 2009 that it intended to move forward with the project. *Id.* ¶ 120. Despite this warning, Luxexpress–II endeavored to expand its operations on the condemned property, including arranging meetings to explore opening a Harley–Davidson motorcycle dealership and a Marriott hotel. *Id.* ¶¶ 130–33. Those plans crumbled on July 25, 2012, when the Ivanenkos learned that their buildings and equipment had been "totally demolished." *Id.* ¶ 134. Alamo Group never recovered the automobiles and parts that it kept at the property. Mark Reznick, Decl. ¶ 24. According to appellants, the property never became a railway bridge; instead, it was converted into a sports facility owned by relatives of the former Director General of the Ukraine South–Western Railway. 2d Am. Compl. ¶ 11. With their business in ruins and facing death threats for having accused Ukrainian officials of graft, the Ivanenkos left Ukraine and sought political asylum in the United States. *Id.* ¶¶ 147–49.

In May 2015, Luxexpress–II and the Ivanenkos filed suit against thirty Ukrainian officials in the Southern District of New York and shortly thereafter amended their complaint to add Ukraine as a defendant. *See Luxexpress 2016 Corp. v. Gov't of Ukraine*, No. 15–CV–4880 (VSB), 2018 WL 1626143, at *2 (S.D.N.Y. Mar. 30, 2018). Following a pre–motions conference, the district court granted appellants leave to further amend their complaint. *Id.* The second amended complaint, filed by Luxexpress–II, Luxexpress 2016 Corporation (the successor in interest to Luxexpress–II), Alamo Group, and the Ivanenkos, alleged violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, as well as claims for wrongful expropriation, fraud, abuse of process, and conversion. *See id.* at *1. Ukraine moved to dismiss, and the district court, finding that venue was improper, transferred the case to the District of Columbia. *Id.*

There, Ukraine renewed its motion to dismiss, arguing that it was entitled to sovereign immunity pursuant to the FSIA. The district court agreed, concluding that none of the three FSIA exceptions invoked by appellants conferred jurisdiction. *Luxexpress 2016 Corp. v. Gov't of Ukraine*, No. 18–cv–812 (TSC), 2020 WL 1308357, at *10 (D.D.C. Mar. 19, 2020). It rejected appellants' reliance on the FSIA's expropriation exception, reasoning that Ukraine's taking of its own citizens' property did not violate international law and that Alamo Group failed to plausibly allege that its property was operated by an instrumentality of Ukraine engaged in commercial activity in the United States. *Id.* at *3–6. The FSIA's commercial activity exception did not vitiate Ukraine's immunity, the district court explained, because the alleged taking was an exercise of sovereign authority, not commercial conduct. *Id.* at *6. And the district court found that Ukraine had not waived its immunity and thus the FSIA's waiver

exception was inapplicable. *Id.* at \*8–9. After the district court dismissed Ukraine from the suit with prejudice, *see* Order (Mar. 19, 2020), appellants voluntarily dismissed the individual defendants and noted this appeal.

**II.**

Pursuant to the FSIA, "a foreign state shall be immune from the jurisdiction of the courts of the United States" unless one of the statute's enumerated exceptions applies. 28 U.S.C. § 1604. The FSIA thus "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). This broad grant of immunity reflects "the absolute independence of every sovereign authority and helps to induce each nation state, as a matter of international comity, to respect the independence and dignity of every other, including our own." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1319 (2017) (internal quotation marks, alteration, and citation omitted).

The court reviews *de novo* the district court's jurisdictional determinations. *Schubarth*, 891 F.3d at 398. Where, as here, the dispute centers on the sufficiency of the plaintiffs' jurisdictional allegations, "dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Id.* (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002)). It is the defendant's burden to establish sovereign immunity, "including that 'the plaintiff's allegations do not bring its case within a statutory exemption to immunity.'" *Id.* (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).

Appellants challenge the district court's dismissal of Ukraine, contending that the second amended complaint sets forth sufficient facts to establish three FSIA exceptions: the expropriation exception, the commercial activity exception, and the waiver exception. 28 U.S.C. § 1605(a)(1)–(3). We disagree.

**A.**

Appellants first maintain that the FSIA's expropriation exception permits their lawsuit against Ukraine. In their view, Ukraine's "total destruction" of their property was a taking in violation of international law, particularly because Ukraine acted with the "discriminatory intent" to punish the Ivanenkos for promoting Western business interests. Pls.' Br. 22. Relevant here, the FSIA's expropriation exception divests a foreign state of its immunity in any action "in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property . . . is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3). "For the exception to apply, therefore, the court must find that: (1) rights in property are at issue; (2) those rights were taken in violation of international law; and (3) a jurisdictional nexus exists between the expropriation and the United States." *Schubarth*, 891 F.3d at 398–99 (quoting *Nemariam v. Fed. Democratic Republic of Ethiopia*, 491 F.3d 470, 475 (D.C. Cir. 2007)).

The district court correctly determined that appellants' lawsuit does not fall within the FSIA's expropriation exception. With respect to Luxexpress–II and the Ivanenkos, their claims are barred by the "domestic takings rule," which provides that a foreign state's seizure of its citizens' property

within its territory does not violate international law. *See Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 709 (2021); *United States v. Belmont*, 301 U.S. 324, 332 (1937). At the time the district court ruled on Ukraine's motion to dismiss, the law of this circuit was that an intrastate taking was "ordinarily not a concern of international law" and therefore, "as a general matter, a plaintiff bringing an expropriation claim involving an intrastate taking cannot establish jurisdiction under the FSIA's expropriation exception." *Simon v. Republic of Hungary*, 812 F.3d 127, 144–45 (D.C. Cir. 2016), *abrogated by Philipp*, 141 S. Ct. 703. But that rule was not absolute. For instance, this court had recognized that a foreign state's seizure of its citizen's property in furtherance of a genocide violated international law within the meaning of the FSIA's expropriation exception. *See id.* at 132. While this appeal was pending, however, the Supreme Court repudiated this court's approach, holding in *Federal Republic of Germany v. Philipp*, 141 S. Ct. 703 (2021), that the domestic takings rule admits of no exception, *id.* at 715. Therefore, Ukraine's alleged taking of property owned by Luxexpress–II and the Ivanenkos does not implicate § 1605(a)(3).

Although the domestic takings rule does not apply to Alamo Group, it failed to show that its property is "owned or operated" by an instrumentality of Ukraine. 28 U.S.C. § 1605(a)(3). To start, the second amended complaint lacks any allegations that an instrumentality of Ukraine took control of appellants' property after it was seized in 2012. In fact, appellants claimed that while their property was ostensibly taken to construct a railway bridge, it was actually used to build a sports facility owned by relatives of the Former Director General of the Ukraine South–Western Railway. 2d Am. Compl. ¶ 11. Moreover, even assuming, *arguendo*, that the Ukraine South–Western Railway occupies the land that Luxexpress–II had leased, there are no allegations that it

"owned or operated" Alamo Group's property. Rather, appellants alleged that Ukraine "totally demolished" their "business and buildings." *Id.* ¶ 134. In the same vein, Mark Reznik, Alamo Group's principal owner, attested that Ukraine "destroyed" the computers and other equipment that Alamo Group kept in Luxexpress–II's building and "stole" its automobiles and auto parts. Reznik Decl. ¶¶ 23–24. As such, the FSIA's expropriation exception does not apply to Alamo Group's claims against Ukraine. *See Nemariam*, 491 F.3d at 481.

**B.**

Appellants' second contention is that the FSIA's commercial activity exception defeats Ukraine's immunity. That exception contains three clauses each of which establishes an independent basis for asserting jurisdiction over a foreign state based on its commercial activities. 28 U.S.C. § 1605(a)(2). This case implicates the third clause, which permits a suit to proceed against a foreign state if it is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *Id.* Known as the "direct effect" clause, it applies if three requirements are met: (1) "the lawsuit must be based upon an act that took place outside the territory of the United States"; (2) "the act must have been taken in connection with a commercial activity"; and (3) "the act must have caused a direct effect in the United States." *Rong v. Liaoning Province Gov't*, 452 F.3d 883, 888–89 (D.C. Cir. 2006) (citing *Republic of Argentina v. Weltover*, 504 U.S. 607, 611 (1992)).

Appellants' reliance on the commercial activity exception founders on the second element — that Ukraine's alleged conduct was "in connection with a commercial activity." The

FSIA instructs that the "commercial character of an activity shall be determined by reference to the nature of" the activity, "rather than by reference to its purpose." 28 U.S.C. § 1603(d). To determine the nature of an activity, the court examines whether the foreign state's actions "are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Weltover*, 504 U.S. at 614 (citation omitted). A foreign state engages in commercial activity when it "exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns.'" *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (quoting *Weltover*, 504 U.S. at 614).

This court addressed whether the expropriation of property qualifies as commercial activity in *Rong*, 452 F.3d 883. In that case, Rong, a Chinese national, sued a subdivision of China, alleging that the province unlawfully seized his automobile manufacturing company without compensation and sold the assets to a wholly–owned state entity. *See id.* at 885–87. The court affirmed the dismissal of Rong's suit, rejecting his contention that the province engaged in commercial activity within the meaning of § 1605(a)(2). *Id.* at 891. Although acknowledging that the province's takeover and management of Rong's company "seem commercial," the court observed that "these acts flow from the Working Committee's 'state assets' declaration — an act that can be taken only by a sovereign." *Id.* at 889. Consequently, the taking "constituted a quintessentially sovereign act, not a corporate takeover," and so the commercial activity exception did not apply. *Id.* at 890.

As in *Rong*, appellants' lawsuit stems from an exercise of eminent domain. They allege that Ukraine "took [their] business and property as part of a concerted plan and scheme to expropriate pro–Western businesses." 2d Am. Compl. ¶ 6. That scheme, appellants claim, was orchestrated "by Ukrainian

government officials," including the Office of the President, "to benefit those government officials and their family members." *Id.* ¶ 1. These allegations describe conduct that is "quintessentially sovereign," *Rong*, 452 F.3d at 890, and which could not have been carried out by a private participant in the marketplace, *see Nelson*, 507 U.S. at 362. It follows that appellants cannot satisfy the FSIA's commercial activity exception.

Notwithstanding *Rong*, appellants insist that Ukraine's conduct qualifies as commercial activity because Ukraine's "real purpose" for expropriating their property was to use it "as a golf course and sports facility, which was operated commercially." Pls.' Br. 31. This contention is foreclosed by the Supreme Court's precedent and those of this court. As the Supreme Court has explained, "whether a state acts 'in the manner of' a private party is a question of behavior, not motivation." *Nelson*, 507 U.S. at 360; *see Weltover*, 504 U.S. at 614. Consistent with that teaching, this court concluded in *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164 (D.C. Cir. 1994), that state–supported hostage taking is not commercial activity, *id.* at 167–68. Similarly, in *Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005), the court refused to view Afghanistan's harboring of terrorist camps as the "provision of land for money," observing that, "in determining whether particular conduct constitutes commercial activity," the "key" question "is not to ask whether its purpose is to obtain money, but rather whether it is 'the sort of action by which private parties can engage in commerce,'" *id.* at 17 (quoting *Nelson*, 507 U.S. at 362). And in *Rong*, 452 F.3d at 890, the court held that the province's "subsequent acts" with Rong's property "did not transform the . . . expropriation into commercial activity." Were it otherwise, the court observed, "almost any subsequent disposition of expropriated property could allow the sovereign to be haled into federal court under FSIA," an

outcome "inconsistent with [the court's] precedent, the decisions of other circuits, and the [FSIA's] purpose." *Id.* So too here, Ukraine's motives and its subsequent use of appellants' property do not alter the analysis.

## C.

Finally, appellants contend that the FSIA does not bar their lawsuit because Ukraine waived its sovereign immunity. The FSIA allows courts to exercise jurisdiction over a foreign state if it "waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). A foreign state explicitly waives its sovereign immunity in a treaty or contract only if it "clearly and unambiguously" agrees to suit. *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002); *cf. Amerada Hess Shipping*, 488 U.S. at 442–43. As for implied waivers, this court has recognized that a foreign state implicitly dispenses with its immunity in only three circumstances: by (1) executing a contract containing a choice–of–law clause designating the laws of the United States as applicable; (2) filing a responsive pleading without asserting sovereign immunity; or (3) agreeing to submit a dispute to arbitration in the United States. *World Wide Minerals*, 296 F.3d at 1161 n.11; *see Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990). In either instance, the touchstone of the waiver exception remains the same: "that the foreign state have *intended* to waive its sovereign immunity." *Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999) (emphasis added).

According to appellants, Ukraine waived its immunity by entering into a bilateral investment treaty with the United States in 1994. Alternatively, they submit that Ukraine waived its immunity in 2016 when then–President Petro Poroshenko issued a decree authorizing the Ministry of Justice to litigate

and settle claims brought by Ukrainian nationals in foreign courts. These contentions fail. The treaty on which appellants rely — the Treaty Between the United States of America and Ukraine Concerning the Encouragement and Reciprocal Protection of Investment, Ukr.–U.S., Mar. 4, 1994, T.I.A.S. No. 96–1116 — merely obligates each signatory nation to entertain certain suits in its own courts. Article III of the treaty, which addresses the expropriation of property, states: "A national or company of either Party that asserts that all or part of its investment has been expropriated shall have a right to prompt review by the appropriate judicial or administrative authorities of the other Party." *Id.*, art. III, ¶ 2. Likewise, Article VI provides that an individual or company may resolve an investment dispute involving a signatory nation in "the courts or administrative tribunals of the Party that is a party to the dispute." *Id.*, art. VI, ¶ 2(a). Thus, the treaty's terms do not amount to a clear and unambiguous waiver of Ukraine's sovereign immunity in United States courts.

Appellants' reliance on a 2016 presidential decree is also unavailing. That decree defines a "foreign entity" for the purposes of Ukrainian law to include "citizens of Ukraine" who "present in a foreign jurisdiction body a claim against Ukraine." Decree of the President of Ukraine On Amending the Procedure of Protection of Rights and Interests of Ukraine during Settlement of Disputes, Proceedings in Foreign Jurisdiction Bodies of Cases Involving a Foreign Entity and Ukraine, No. 60/2016, ¶ 3 (Feb. 22, 2016). In so doing, the decree empowers Ukraine's Ministry of Justice to represent Ukraine in these suits and, among other things, to "take measures necessary to reach agreements with a foreign entity . . . on mutually beneficial and mutually acceptable terms." *Id.* ¶ 6(1). These general and ambiguous provisions are not tantamount to an express waiver of sovereign immunity, especially as the decree also authorizes the Ministry of Justice

to present "Ukraine's immunity in a case initiated in a foreign jurisdiction body on a claim against Ukraine." *Id.* ¶ 7(3). Nor does the decree impliedly waive Ukraine's immunity as it does not contain either a choice–of–law provision or an agreement to arbitrate in the United States. In sum, because neither the treaty nor the decree meet "the exacting showing required for waivers of foreign sovereign immunity," *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 35 (D.C. Cir. 2014), appellants' lawsuit cannot proceed under the FSIA's waiver exception.

Accordingly, the court affirms the district court's dismissal of Ukraine for lack of subject–matter jurisdiction.