# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 13, 2018      Decided May 14, 2019

No. 15-7034

ESTATE OF ESTHER KLIEMAN, BY AND THROUGH ITS
ADMINISTRATOR, AARON KESNER, ET AL.,
APPELLANTS

v.

PALESTINIAN AUTHORITY, ALSO KNOWN AS PALESTINIAN
INTERIM SELF-GOVERNMENT AUTHORITY AND PALESTINIAN
LIBERATION ORGANIZATION, ALSO KNOWN AS PLO,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cv-01173)

———

*Edward B. MacAllister* argued the cause for appellants.
With him on the briefs were *Richard D. Heideman*, *Tracy
Reichman Kalik*, and *Steven R. Perles*.

*Mitchell R. Berger* argued the cause for appellees. With
him on the brief were *Gassan A. Baloul* and *Alexandra E.
Chopin*. *Pierre H. Bergeron*, *John Burlingame*, and *Laura G.
Ferguson* entered appearances.

Before: GARLAND, *Chief Judge*, KATSAS, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: During the Second Intifada, Palestinian terrorists ambushed an Israeli public bus traveling in the West Bank and opened fire, killing an American schoolteacher, Esther Klieman. Klieman's estate (along with some survivors and heirs) sued numerous defendants— including the Palestinian Authority ("PA") and Palestinian Liberation Organization ("PLO")—under the Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2331, *et seq*., among other laws. Having previously dismissed the case against all non-PA/PLO defendants for insufficient service of process, *Estate of Klieman v. Palestinian Auth.*, 547 F. Supp. 2d 8, 15 (D.D.C. 2008), the district court dismissed the case against the PA/PLO for want of personal jurisdiction under the constraints of the due process clause, *Estate of Klieman v. Palestinian Auth.*, 82 F. Supp. 3d 237 (D.D.C. 2015). Plaintiffs now appeal.

In *Livnat v. Palestinian Authority*, 851 F.3d 45, 48–54 (D.C. Cir. 2017), *cert. denied*, 139 S. Ct. 373 (2018), this court held that the due process clause of the 5th Amendment barred U.S. courts from exercising jurisdiction over non-sovereign foreign entities without an adequate nexus to the United States. (In contrast, foreign sovereigns sued in the United States do not enjoy the benefit of this due process protection.) The district court here found that plaintiffs had failed to establish such a nexus for the PA/PLO.

We agree. We conclude that the district court did not abuse its discretion in agreeing, in light of the intervening Supreme Court case of *Daimler AG v. Bauman*, 571 U.S. 117 (2014), to reconsider its earlier ruling that the court had general personal

jurisdiction over defendants. As plaintiffs recognize, *Daimler* (and this court's opinion in *Livnat*) effectively foreclose a ruling that the district court had general jurisdiction over the PA/PLO. See Klieman Br. 29. We then consider plaintiffs' argument for specific jurisdiction and their request for discovery to substantiate that theory, but find both sets of arguments inadequate. Finally, we address § 4 of the Anti-Terrorism Clarification Act of 2018, Pub. L. No. 115-253, 132 Stat. 3183 ("ATCA") (codified at 18 U.S.C. § 2334(e)), enacted during the pendency of this appeal and deeming certain conduct to qualify as consent to the jurisdiction of U.S. courts over terrorism cases. We find that plaintiffs have established neither the circumstances rendering § 4 applicable nor facts justifying a remand for discovery on the issue. Accordingly, we affirm the decision of the district court.

\* \* \*

On March 24, 2002, a group of terrorists carried out an attack on an Israeli bus in the West Bank, killing Esther Klieman. See *Estate of Klieman*, 82 F. Supp. 3d at 240; see also Compl. ¶¶ 23–25 (Jul. 13, 2004), ECF No. 1.[1] Plaintiffs brought suit in 2004 against a host of defendants, including the PA, PLO, and other Palestinian individuals and entities, including the Al Aqsa Martyrs Brigade, a U.S.-designated Foreign Terrorist Organization that had "claimed responsibility for the attack." *Estate of Klieman*, 82 F. Supp. 3d at 240.

Plaintiffs allege among other things that the PA/PLO, acting "by and through their officials, employees and agents," had "provided" other defendants "weapons, instrumentalities,

---

[1] Citations to ECF Numbers are to the district court docket in *Estate of Klieman v. Palestinian Authority*, No. 1:04-cv-01173-PLF (D.D.C. filed Jul. 13, 2004).

permission, training, and funding for their terrorist activities," along with "safe haven and a base of operations," and encouraged certain defendants to "plan and execute acts of violence, murder and terrorism against innocent civilians in Israel, Gaza and the West Bank"—including the attack that killed Klieman. Compl. ¶ 40; see also Compl. ¶¶ 41–49. Besides asserting various tort claims, plaintiffs alleged violations of the ATA, 18 U.S.C. §§ 2332, 2333, and 2339A. See Compl. ¶¶ 50–60. Section 2333 creates a cause of action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a); see *id.* § 2331(1) (defining "international terrorism"). And § 2333(d)(2) creates liability for persons who have aided or abetted, or conspired with a designated foreign terrorist organization (such as the Al Aqsa Martyrs Brigade) in the commission of terrorist acts.

Defendants moved in May 2006 to dismiss the case for lack of personal jurisdiction, asserting among other problems that they had insufficient "minimum contacts" with the United States. See Defs.' Mot. to Dismiss for Lack of Personal Jurisdiction 3 (May 30, 2006), ECF No. 55. As to the PA/PLO, the district court initially ruled, in December 2006, that it could exercise general jurisdiction over these defendants. *Estate of Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107, 113 (D.D.C. 2006). In April 2008, it denied defendants' motion for reconsideration of that decision. Mem. Op. and Order (Apr. 24, 2008), ECF No. 85. Fact discovery proceeded until 2013.

In February 2014, defendants filed a motion for reconsideration of the 2006 and 2008 rulings, invoking the requirements for general personal jurisdiction set forth in *Daimler*, 571 U.S. at 137. See Defs.' Mot. for Reconsideration (Feb. 5, 2014), ECF No. 233. The district court agreed to reconsider the matter. It also embraced defendants'

jurisdictional argument, finding that the PA/PLO are not "at home" in the United States, as required for purposes of *general* jurisdiction under *Daimler*. It then found unpersuasive plaintiffs' theory of *specific* jurisdiction and denied their request for jurisdictional discovery. As the PA/PLO had been the "sole remaining defendants," the district court dismissed the case. *Estate of Klieman*, 82 F. Supp. 3d at 250.

Following the roadmap laid out above, we affirm.

\* \* \*

The due process limits on judicial exercise of personal jurisdiction over non-resident defendants take two forms: "general or all-purpose jurisdiction, and specific or conduct-linked jurisdiction." *Daimler*, 571 U.S. at 122. General jurisdiction licenses a court "to hear any and all claims against" a defendant, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)—no matter where arising. Specific jurisdiction permits a court only to hear disputes that "aris[e] out of or relat[e] to the defendant's contacts with the forum." *Daimler*, 571 U.S. at 127 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)).

General jurisdiction entails a relatively demanding standard—reflecting its plenary reach over a defendant's affairs. "A court may assert general jurisdiction over foreign . . . corporations to hear any and all claims against them when their affiliations with the [forum] are so 'continuous and systematic' as to render them *essentially at home* in the forum . . . ." *Daimler*, 571 U.S. at 127 (emphasis added) (quoting *Goodyear*, 564 U.S. at 919). The upshot is that, absent exceptional circumstances, see, e.g., *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952), general jurisdiction will lie only where an entity is formally

incorporated or maintains its principal place of business, see *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017); *Daimler*, 571 U.S. at 138–39 & n.19.

Specific jurisdiction's more limited scope justifies a less onerous standard. First, a defendant need not be "at home" in the forum. Second, unlike with general jurisdiction, minimum contacts must stem from or relate to conduct giving rise to the suit. Plaintiffs must establish a relationship among "the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 291 (2014) (quoting *Calder v. Jones*, 465 U.S. 783, 788 (1984)). More specifically, for a court "to exercise [specific] jurisdiction consistent with due process, the defendant's *suit-related conduct* must create a *substantial connection* with the forum." *Id*. at 284 (emphases added).

Where, as here, a claim arises under federal law and, as the parties agree, a "defendant is not subject to jurisdiction in any state's court of general jurisdiction," Fed. R. Civ. P. 4(k)(2)(A); see *Estate of Klieman*, 82 F. Supp. 3d at 244, personal jurisdiction may be asserted under Rule 4(k)(2), "which functions as a federal long-arm statute," *id*. Besides proper service of process, it requires only that "exercising jurisdiction [be] consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2)(B); see *Mwani v. bin Laden*, 417 F.3d 1, 10–11 (D.C. Cir. 2005). With that requirement met, the relevant forum is "the United States as a whole." *Mwani*, 417 F.3d at 11; accord, e.g., *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 6 (1st Cir. 2018).

\* \* \*

In the wake of *Daimler*, defendants moved for reconsideration of the court's 2006 and 2008 rulings on personal jurisdiction. The district court granted the request, and plaintiffs now object.

We review the district court's decision to reconsider the issue for abuse of discretion. See, e.g., *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 225 (D.C. Cir. 2011); accord *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 341 n.9 (D.C. Cir. 1991) ("[T]he abuse of discretion standard ordinarily applies to a district judge's decision *whether to consider* a new theory raised on motion for reconsideration."). The district court divided the matter into a segment on the propriety of reconsideration vel non and the plaintiffs' claim of waiver or forfeiture. We address both issues, but in the reverse order.

Although the PA/PLO raised its personal jurisdiction defense in a pre-answer motion under Rule 12(b)(2), thereby avoiding forfeiture under Rule 12(h)(1), the plaintiffs argue that defendants' failure to raise the claim promptly after the Supreme Court's decision in *Goodyear*, 564 U.S. at 919, the precursor of *Daimler*, waived or forfeited the personal jurisdiction defense. See Klieman Br. 17–20; see also Pls.' Opp'n to Defs.' Mot. to Strike 3 (Nov. 2, 2018), Dkt. No. 1758524.

Plaintiffs point out that "more than 250 federal court cases" have "discussed *Goodyear*'s 'at home' standard, including eighteen circuit court cases and three cases in this District." Klieman Br. 24 (quoting *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 8 F. Supp. 3d 9, 16 (D.D.C. 2014), *aff'd*, 843 F.3d 958 (D.C. Cir. 2016)). They note, too, that defense counsel in this litigation at the time of *Goodyear* had invoked the "at-home" language on behalf of the PA/PLO in other lawsuits shortly after *Goodyear* was decided—as well as in 2013. *Id*. at 25. Defendants' wait till 2014 to file the motion, plaintiffs conclude, constitutes undue delay. Further, they say the delay was prejudicial because the motion wasn't filed until *after* fact discovery had closed. *Id*. at 21, 30. As plaintiffs see it, they were, in effect, precluded from taking discovery to

support their specific jurisdiction theory, since at the time they had (reasonably) relied on the district court's prior decision confirming personal jurisdiction. See *id*. at 12, 20–21, 36.

Defendants respond that *Goodyear*, and this circuit's post-*Goodyear* but pre-*Daimler* cases, show sufficient room for nuance as to the status and reach of *Goodyear*'s "at-home" language that it was not unreasonable to seek reconsideration only after *Daimler*. And they argue that the timing of their motion was not prejudicial. See PA/PLO Br. 24–27.

In finding the motion for reconsideration not barred by delay, the district court acknowledged that *Goodyear* had introduced the "at-home" language, but argued that "the reach of this language was not immediately clear," citing the 2013 supplement of a leading procedure treatise for the view that, "[i]f the *Goodyear* opinion stands for anything . . . it simply reaffirms that defendants must have continuous and systematic contacts with the forum in order to be subject to general jurisdiction." *Estate of Klieman*, 82 F. Supp. 3d at 243. The court believed that *Goodyear*'s full import as a departure from laxer standards was "appreciated" only after *Daimler* issued in 2014. *Id*. Defendants thus did not proceed with "undue delay." And the court noted that neither plaintiffs nor the court could identify a case in which a similar motion was denied on grounds of "delay in identifying intervening case law." *Id*.

We see no abuse of discretion in the ruling on forfeiture (which the district court styles as a "waiver" analysis). On the one hand, in light of in-circuit cases elaborating on the "at-home" doctrine pre-*Daimler*—and defense counsel's arguments on behalf of PA/PLO in other suits—there is some force to plaintiffs' argument that defendants' delay was unjustifiable. But a few points are dispositive in favor of defendants' view. First, as a general matter, a district court has leeway "always" to "reconsider[]" interlocutory orders not

subject to the law of the case doctrine "prior to final judgment." "[S]o long as the court has jurisdiction over an action, it should have complete power over interlocutory orders made therein and should be able to revise them when it is consonant with equity to do so." *Langevine v. Dist. of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997) (quoting *Schoen v. Washington Post*, 246 F.2d 670, 673 (D.C. Cir. 1957)); see also Fed. R. Civ. P. 54(b). Second, the court properly gave weight to the uncertainty in the wake of *Goodyear*, so clearly reflected in the passage quoted above from a leading treatise on procedure. Third, the court plausibly concluded that plaintiffs were not prejudiced by the timing of the motion.

To be sure, under some circumstances we would be swayed by plaintiffs' argument that they have been prejudiced by the delay in the defendants' *Goodyear-Daimler* motion—coupled with their reasonable reliance on the district court's finding of general personal jurisdiction and the closure of fact discovery. But here, as we'll develop later in this opinion, plaintiffs have been unable to make a showing that discovery on their specific jurisdiction theory could have yielded evidence to support a finding of specific jurisdiction, and there is no sign that the district court relied at all on the "closure" of discovery in deciding to deny plaintiffs' motion for further discovery to explore facts relevant to specific jurisdiction.

Our approach is in keeping with *Gilmore v. Palestinian Interim Self-Government Authority*, 843 F.3d 958, 963–65 (D.C. Cir. 2016). There we affirmed the district court's decision under Rule 12(h)(1) that the PA/PLO had waived a constitutional personal jurisdiction defense that had been "available" because they had altogether failed to raise it in their 2002 pre-answer motion. The delay argument pressed here is quite different from the 12(h)(1) issue in *Gilmore*; defendants here asserted constitutional personal jurisdictional defenses in 2006 and 2007 on the basis of insufficient "minimum contacts"

with the forum in advance of filing their answer in May 2008. See Defs.' Mot. to Dismiss for Lack of Personal Jurisdiction 3 (May 30, 2006), ECF No. 55; see also Answer 2 (May 2, 2008), ECF No. 86; cf. *Estate of Klieman*, 467 F. Supp. 2d at 110, 113. So defendants essentially proceeded as *Gilmore*'s holding would have envisaged—on the basis of defenses "available" at the time of their pre-answer filings. In *Gilmore* we didn't pass on the district court's alternative theory of forfeiture based on acquiescence in the court's jurisdiction. See *Gilmore*, 8 F. Supp. 3d at 14–16. We need not do so now. Even if we had affirmed the district court in reliance on the acquiescence theory, finding *no* abuse of discretion *there*, and even if the district court's decision were inconsistent with the one we're now reviewing, this outcome would not establish that the latter was an abuse of discretion.

As to the motion for reconsideration viewed separately from the delay issue, the district court noted that the Federal Rules of Civil Procedure do not state standards governing such a motion before judgment, *Estate of Klieman*, 82 F. Supp. 3d at 241–42, and in this gap relied on a three-part test from *In re Vitamins Antitrust Litig.*, No. 99-1097, 2000 WL 34230081 (D.D.C. Jul. 28, 2000); accord, e.g., *McCoy v. FBI*, 775 F. Supp. 2d 188, 190 (D.D.C. 2011) (Wilkins, J.) (adopting the *Vitamins* test). That opinion said that, given the value of finality, interlocutory orders may be reconsidered only "when the movant demonstrates (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error of law in the first order." *Vitamins*, 2000 WL 34230081, at *1; cf. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) ("A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" (citation omitted)). Neither party takes

issue with the *Vitamins* test, and we accept it for present purposes. (The district court had used the same test in *denying* defendants' 2008 motion for reconsideration of its 2006 ruling on personal jurisdiction. See Mem. Op. and Order 2 (Apr. 24, 2008), ECF No. 85.)

We believe the district court acted within the bounds of its discretion in finding reconsideration appropriate. Two criteria of the *Vitamins* test seem applicable—"(1) an intervening change in the law" and "(3) a clear error of law in the first order." Given that the *governing* law applicable at the time of the district court's ruling was *Daimler*, see, e.g., *Landgraf v. USI Film Prod.*, 511 U.S. 244, 273 (1994) (noting that "in many situations, a court should 'apply the law in effect at the time it renders its decision'") (quoting *Bradley v. Sch. Bd. of City of Richmond*, 416 U.S. 696, 711 (1974)), the prior ruling was indeed a clear error of law. Further, it was quite reasonable to say that the law had changed since the court's most recent prior ruling on jurisdiction—2008.

\* \* \*

We now take up the court's disposition of the merits of the motion, including plaintiffs' effort to establish specific jurisdiction, which we review de novo. See *Livnat*, 851 F.3d at 48; *FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008). The district court first concluded that it could not properly exercise general jurisdiction over defendants because they are not "'essentially at home' in the United States." *Estate of Klieman*, 82 F. Supp. 3d at 245 (quoting *Daimler*, 571 U.S. at 127). We agree. Because the PA's "headquarters, officials, and primary activities are all in the West Bank," it is not subject to general jurisdiction in the United States, as we held in *Livnat*, 851 F.3d at 56; see *Waldman v. Palestinian Liberation Org.*, 835 F.3d 317, 332–34 (2d Cir. 2016) (applying similar reasoning to PLO).

Finding plaintiffs' effort to salvage the earlier ruling in favor of general personal jurisdiction unavailing, we turn to the substance of plaintiffs' theory of specific jurisdiction.

To advance that theory, plaintiffs sought to develop a link between the killing of Esther Klieman and the furthering of PA/PLO goals in the United States. They offered a hypothesis building on these elements: First, the PA/PLO supported acts of terrorism during the Second Intifada in the early 2000s, targeting Israelis and areas frequented by Americans. Second, they pursued this terrorist program in part with the goal of advancing their "campaign in the United States to influence or affect United States foreign policy as it related to Israel and the Palestinian territories," Klieman Br. 32; see also *id*. at 42, 43, carrying on the campaign through the use of U.S. offices, fundraising, lobbying, speaking engagements, as well as commercial dealings, *id*. at 32. Third, as an integral part of this blended strategy of terrorism and diplomacy, they facilitated the killing of Esther Klieman.

The first two elements may at first blush seem counterintuitive, but their logic is basically that a spate of terrorism claiming American (and Israeli) lives could impel U.S. policymakers to urge their Israeli counterparts to make concessions to defendants in exchange for their exerting their influence to halt, or attenuate, the attacks. For example, they quote a PA/PLO representative explaining on U.S. national television in 2002 that—in order for Palestinian suicide bombings to abate—the U.S. Secretary of State should prevail on Israel's prime minister to reduce Israeli troop levels and settler presence in contested areas, for, "if the occupation continues . . . no one can stop the Palestinians." *Id*. at 43; see also Reply Br. 22 (same).

The basic theme here appears reasonable and seems to possess historical support. See, e.g., Klieman Br. 35 n.7; cf.

*Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003) (quoting an expert witness on Iran explaining that "the foreign policy objective of the October 23rd, 1983, attack [on the U.S. Marine barracks in Lebanon] and other like attacks by Iran during this period" was "to end the Western, especially the American[,] presence in Lebanon"). Rather, our focus is on the third element of plaintiffs' theory—the alleged link between the overall strategy and the killing of Esther Klieman. Plaintiffs have not alleged tangible facts as to how *this* attack was intended (or even used *ex post*) to further defendants' political aims in the United States. The assertion that "the PA and PLO campaign to influence U.S. policy or affect its conduct, by leveraging the carnage of the Second Intifada, was expressly directed at . . . the United States," Klieman Br. 43, is a claim that might apply to a welter of attacks spanning the years of the Second Intifada. But in a "jurisdictional inquiry focuse[d] on the relationship among the defendant, the forum, and the litigation," *Walden*, 571 U.S. at 287 (internal quotation marks and citation omitted), the "litigation" element requires tangible allegations relating the attack that cost Esther Klieman's life to defendants' contacts with the forum, cf. *Waldman*, 835 F.3d at 341–42.

This circuit's previous decision in *Livnat* appears controlling. The case arose out of a 2011 terrorist attack on Jewish worshipers at Joseph's Tomb, a holy site in the West Bank. *Livnat*, 851 F.3d at 46. Plaintiffs had alleged that the attack was "part and parcel of" the PA's "general practice of using terrorism to influence United States public opinion and policy" and was "intended, through intimidation and coercion, to influence the Israeli and United States government[s'] policies." *Id*. at 57 (quoting complaint). To reinforce these allegations, plaintiffs supplied a declaration by a professor attesting that the PA's support for terrorism was meant to "influence U.S. policy in the [PA's] favor." *Id*. But this didn't convince us of an adequate relation between the Joseph's Tomb

attack and the United States. *Id*. We declined even to consider the legal sufficiency of plaintiffs' theory, given their failure to "'make a prima facie showing of the pertinent jurisdictional facts' to survive a motion to dismiss." *Id*. at 56–57 (citation omitted). Plaintiffs, in essence, had asked us to infer "that because some attacks against Jews and Israelis have been aimed to influence U.S. policy, the Joseph's Tomb attack was, too." *Id*. at 57. "The record before us," we concluded, "does not support that inference." *Id*.

*Livnat*'s logic governs here. Even if some terrorist acts carried out in Israel or the West Bank were used by defendants to influence U.S. policy, nothing in the record indicates that *this* attack fills that bill. Plaintiffs would distinguish *Livnat* by noting that whereas the attacks there were against Jews and Israelis—the present allegations center on attacks on "areas and targets known to be frequented by U.S. citizens." Klieman Br. 35. But the distinction doesn't help plaintiffs on the facts presented. After all, they have alleged no facts indicating that the attack on an Israeli bus in the West Bank was directed at locales with a strong presence of U.S. nationals—either in the form of high-level planning or the individual attackers' motives. To the extent the attackers had—unbeknownst to them—chosen as their target a bus traveling through such a locale, the resulting "random, fortuitous, or attenuated contacts" with the forum are insufficient under *Walden*. A court's "exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on *intentional* conduct by the defendant that creates the necessary contacts with the forum." *Walden*, 571 U.S. at 286 (emphasis added).

In some circumstances allegations of a defendant's general policy might adequately support an inference that the defendant aided and abetted a particular attack in furtherance of that policy. If two countries are engaged in armed conflict, we might be confident in explaining one country's execution of a

bombing raid against the other's territory as part of its general policy of inflicting damage on its adversary. But the case here plainly differs. Apart from any U.S. nexus there is a wholly plausible alternative explanation for defendants' aiding and abetting the attack—dynamics altogether internal to the Israeli-Palestinian conflict. Cf. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (addressing effect of "obvious alternative explanation" (citation omitted)). We think that distinction helps explain *Livnat*'s refusal to draw an inference that "because some attacks against Jews and Israelis have been aimed to influence U.S. policy, the Joseph's Tomb attack was, too." 851 F.3d at 57.

Plaintiffs might fill the resulting gap with allegations that PA/PLO officials invoked this attack in public or private statements in the United States *after* it took place, or perhaps that they took steps in the U.S. to aid and abet this particular attack *before* it occurred with the goal of advancing political objectives in the United States. But they offer nothing resembling such claims. As to the latter tack, plaintiffs "have not alleged [or] provided any prima facie showing . . . that either the PA or the PLO engages in fundraising in the United States," let alone fundraising whose proceeds might have facilitated the 2002 attack. *Estate of Klieman*, 82 F. Supp. 3d at 247 n.7.

Nor does *Calder*'s "effects test" help plaintiffs. See Klieman Br. 38–40. That analysis permits courts, in some instances, to assert jurisdiction over defendants whose conduct outside the forum causes certain "effects" within it. In *Calder* itself the Supreme Court approved a California state court's jurisdiction over two Florida residents—an editor and reporter of the National Enquirer, a Florida corporation. Defendants penned and published a libelous article about a California resident distributed widely in that state. See *Calder*, 465 U.S. at 784–86. In glossing *Calder*'s "effects test," the *Walden*

Court stressed defendants' intentional contacts with the forum. The "crux of *Calder* was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff." *Walden*, 571 U.S. at 287. "[B]ecause publication to third persons is a necessary element of libel . . . the defendants' intentional tort actually occurred *in* California." *Id*. at 288. Thus the "effects" of defendants' libelous article—reputational harms arising in California—"connected the defendants' conduct to *California*, not just to a plaintiff who lived there." *Id*.

Unlike the tort in *Calder*, which had "occurred *in*" the forum, *Walden*, 571 U.S. at 288, the planning, carrying out, and occurrence of Klieman's killing all took place in the West Bank. And the emotional suffering felt by forum residents and (perhaps) foreseen by the attackers cannot without more qualify as the relevant "effect." The *Walden* Court rejected such an approach, reasoning that it would "impermissibly allow[] a *plaintiff's* contacts with the defendant and forum to drive the jurisdictional analysis." *Walden*, 571 U.S. at 289 (emphasis added). Instead, "[t]he proper question is . . . whether the defendant's conduct connects him to the forum in a meaningful way." *Id*. at 290. Here we lack such allegations.

Finally, plaintiffs' invocation of our decision in *Mwani v. bin Laden* is unpersuasive. There defendants' contacts with the United States were manifest in the very act that had precipitated the suit—a "devastating truck bomb" outside the U.S. Embassy in Nairobi, Kenya, in 1998, which "killed more than 200 people, including 12 Americans." *Mwani*, 417 F.3d at 4. In choosing their target, a U.S.-government building, Osama bin Laden and Al Qaeda had manifestly sought "purposefully [to] direct their terror at the United States," *id*. at 14, and "not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States," *id*. at 13. Given conduct "no

doubt . . . 'directed at [and] felt in'" the United States, *id.* (alteration in original) (citation omitted), defendants could "reasonably anticipate being haled into" court there, *id.* at 14 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)), even, as we noted there, if we put aside defendants' "ongoing" plots to carry out attacks in the United States, *id.* at 13. It was thus of no moment that "the plaintiff group was composed of non-U.S. nationals." Klieman Br. 42; see *Mwani*, 417 F.3d at 14.

But whereas the *Mwani* defendants, in attacking a U.S. government outpost, indisputably aimed to kill Americans (at least in part), here we have no basis for inferring that the terrorists who attacked an Israeli bus were instructed, or endeavored, to injure American nationals. And absent intentional targeting, the fact that an American died in a terrorist incident abroad would amount only to a "random, fortuitous, or attenuated" contact "ma[de] by interacting with . . . persons affiliated with the" United States. *Walden*, 571 U.S. at 286. It would thus be inadequate for specific jurisdiction absent a firmer link showing "intentional conduct by the defendant that creates the necessary contacts with the forum." *Id.* at 286.

We note that other circuits have taken a more stringent view of the necessary relation between the tort and in-forum activities than is manifest in *Livnat* and this decision. Thus the court in *Waite v. All Acquisition Corp.*, 901 F.3d 1307 (11th Cir. 2018), ruled that "a tort 'arise[s] out of or relate[s] to' the defendant's activity in a [forum] only if the activity is a 'but-for' cause of the tort." *Id.* at 1314 (first two alterations in original); see also *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 318–19 (3d Cir. 2007) (describing the typically stricter proximate cause or "legal cause" test). Under a but-for view, in-forum activities postdating completion of the wrongful conduct—here, for example, any PA/PLO flourishing of the

killing as part of its U.S. diplomatic efforts—would likely not help in establishing minimum contacts for purposes of specific jurisdiction. Given that plaintiffs' theory fails under our *Livnat* decision, we have no need to consider such cases or assess their possible application to these facts.

We conclude that plaintiffs' prima facie case for specific jurisdiction does not meet the Constitution's requirements. Accordingly, we affirm the district court's determination on this score.

\* \* \*

The district court also turned down plaintiffs' request for discovery in support of their theory of specific jurisdiction.

We review the district court's discovery rulings for abuse of discretion. "[A] district court has broad discretion in its resolution of discovery problems that arise in cases pending before it." *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir. 1983) (quoting *In re Multi-Piece Rim Products Liability Litigation*, 653 F.2d 671, 679 (D.C. Cir. 1981)); see also *Mwani,* 417 F.3d at 17; *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C. Cir. 1994). Just as a plaintiff's personal jurisdiction theory must clear the speculative level, a "request for jurisdictional discovery cannot be based on mere conjecture or speculation." *FC Inv. Grp. LC*, 529 F.3d at 1094.

In opposing defendants' 2014 motion for reconsideration, plaintiffs sought discovery intended to disclose facts under two headings, both focused on aspects of defendants' U.S.-centered activities:

> 1. The extent of Defendants' activities within the United States and this jurisdiction to attempt to influence the foreign policy and public opinion in the

> United States to pressure Israel to change its public policies vis-à-vis the PA, including, but not limited to, information on the consultants, lobbyists and other professionals ret[]ained for this purpose.
>
> 2. The financial investment of the Defendants' commercial contracts with US companies which allow the Defendants to raise revenue in the United States to support the operating budgets of the Defendants, which funded the joint public relations and terrorism campaign. As demonstrated above, funds from the Defendants are then used to support terrorism, including the very terrorists who murdered Esther Klieman.

Pls.' Supp. Br. in Opp'n to Defs.' Mot. for Reconsideration 10 (Jul. 11, 2014), ECF No. 256, J.A. 94. The district court understandably saw the requested discovery as "limited to seeking information about defendants' public advocacy and fundraising activities in the United States." *Estate of Klieman*, 82 F. Supp. 3d at 249. It found that "[e]ven if the plaintiffs did obtain any such evidence through additional discovery . . . the plaintiffs would be unable to meet their burden of showing either general or specific personal jurisdiction under *Daimler* and *Walden*." *Id*. Given the failure of these requests to focus on what we have identified as the fatal gap in plaintiffs' allegations, the purpose of the bus ambush in which the terrorists killed Esther Klieman, we can find no abuse of discretion in this result. See *Livnat*, 851 F.3d at 57 ("A district court acts well within its discretion to deny discovery when no 'facts additional discovery could produce . . . would affect [the] jurisdictional analysis.'") (alteration in original) (quoting *Goodman Holdings*, 26 F.3d at 1147)); see also *Mwani*, 417 F.3d at 6, 17.

In their appellate briefs plaintiffs express a new wish to seek discovery as to facts far beyond their original request, facts which might close the gap that we (and *Livnat*) have identified: They ask for

> jurisdictional discovery on whether the PA and PLO directed terrorists to attack Americans, such as in this case, or launch their attacks against areas and targets frequented by Americans. Discovery into the proximity of PA/PLO-attributed attacks to concentrations of U.S. citizens, such as well-known tourist areas frequented by U.S. citizens or areas where U.S. citizens lived, would be one fruitful area of discovery.

Klieman Br. 33; see also Reply Br. 15. But even if such discovery was aimed closely enough at the missing link in plaintiffs' allegations, they failed to make the request to the district court, and "issues not raised before judgment in the district court are usually considered to have been [forfeited] on appeal." *Murthy v. Vilsack*, 609 F.3d 460, 465 (D.C. Cir. 2010); accord, e.g., *Texas v. United States*, 798 F.3d 1108, 1113 (D.C. Cir. 2015); *United States v. Stover*, 329 F.3d 859, 872 (D.C. Cir. 2003). Accordingly, these late requests provide no basis for overturning the district court's exercise of discretion over the requests plaintiffs did make.

\* \* \*

Having addressed the case as initially briefed, we now turn to the ATCA, enacted during the pendency of this appeal. Pursuant to ATCA § 4, certain conduct after January 31, 2019, is deemed to qualify as consent to the jurisdiction of U.S. courts over terrorism cases.

The parties spar over the factual predicates for the application of ATCA § 4, as well as its constitutionality. We conclude that plaintiffs have not made an adequate showing that any of § 4's factual predicates has been triggered between February 1, 2019, and the time of the parties' latest round of briefing on the subject on March 13, 2019. Section 4, accordingly, does not affect our analysis of personal jurisdiction, and we need not reach the defendants' constitutional challenges.

Section 4 identifies five factual predicates grouped under two headings to trigger its "deemed to have consented" clause. See 18 U.S.C. § 2334(e). The first heading, § (e)(1)(A), refers to "accept[ing]" "any form of assistance, however provided," under the following parts of the Foreign Assistance Act of 1961, 22 U.S.C. §§ 2151 *et seq.*:

> (1) chapter 4 of part II, 22 U.S.C. §§ 2346 *et seq.*;

> (2) section 481, 22 U.S.C. § 2291; or

> (3) chapter 9 of part II, 22 U.S.C. §§ 2349bb *et seq.*

The second heading, § (e)(1)(B), refers to a defendant "benefiting from a waiver or suspension of section 1003" of the ATA, 22 U.S.C. § 5202, and

> (4) "continu[ing] to maintain"— or

> (5) "establish[ing] or procur[ing]"—

"any office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States."

As we noted earlier, once defendants raise personal jurisdiction as a defense, "[t]he plaintiffs have the burden of establishing the court's personal jurisdiction over" defendants.

*FC Inv. Grp. LC*, 529 F.3d at 1091. To do so, they must "'make a prima facie showing of the pertinent jurisdictional facts' to survive a motion to dismiss for lack of personal jurisdiction." *Livnat*, 851 F.3d at 56–57 (quoting *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988)). We analyze the record on the factual predicates as an extension of plaintiffs' prima face case for personal jurisdiction, asking whether plaintiffs have put forward plausible allegations that meet any of the factual predicates for implied consent under § 4. Cf. *Iqbal*, 556 U.S. at 679 ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.").

The government filed an amicus brief at the invitation of the court and agrees with defendants that § 4's factual predicates have not been satisfied. "[A]s of February 1, 2019 and since that date, defendants have not accepted any of the foreign assistance provided under the authorities enumerated in Section 4, and they do not currently 'benefit[]' from a waiver of section 1003 of the Anti-Terrorism Act of 1987, including to maintain an office in the United States pursuant to such a waiver." United States' Response to Feb. 6, 2019, Order 7 (Feb. 15, 2019) ("U.S. Response"), Dkt. No. 1773566.

Plaintiffs demur as to both subsections (A) and (B) of § (e)(1). We ultimately find, in keeping with the view of the United States, that plaintiffs have failed to offer plausible allegations that any of the factual predicates of ATCA § 4 has been met or to offer credible grounds to support their requested remand for discovery.

*Foreign assistance and § 4(e)(1)(A)*. The PA/PLO offered its December 26, 2018, letter to the State Department as conclusively rejecting aid covered by ATCA. Plaintiffs say that the letter "merely expresses a 'wish' to no longer receive" relevant forms of assistance. Klieman Supp. Br. 7 (Mar. 13, 2019), Dkt. No. 1777379. Hardly. The letter is quite emphatic:

"The Government of Palestine unambiguously makes the choice not to accept such assistance." U.S. Response, Exhibit 1, Letter at 2. And the State Department and Department of Justice readily discerned its meaning. See U.S. Response 7.

Plaintiffs refer to certain "debt relief grant agreements with the PA" dating to 2015 and 2016, Klieman Supp. Br. 7–8, which were indeed provided under the Economic Support Fund covered by § 4(e)(1)(A)(i), see *Foreign Assistance: U.S. Assistance for the West Bank and Gaza, Fiscal Years 2015 and 2016*, Gov't Accountability Office (Aug. 2018), https://www.gao.gov/assets/700/693823.pdf. But plaintiffs (1) fail to allege that any such forms of debt relief have persisted after January 31, 2019; and (2) do not grapple with the PA/PLO's renunciation of all relevant funding sources. Because we lack credible allegations that debt relief grants are currently being provided to PA/PLO, its instrumentalities, or creditors as of February 1, 2019—or that any of these "accept" such relief—plaintiffs' mere allusions to past examples and hypothesizing their continuation or renewal is not enough to warrant a remand.

The same goes for plaintiffs' references to funding for non-governmental organizations. See Klieman Supp. Br. 8. Plaintiffs rely on a Congressional Research Service report from 2011, which is unconvincing as to February 2019. Second, a gap remains in plaintiffs' analysis. Section 4(e)(1)(A) requires that defendants "accept" the relevant aid, yet plaintiffs allude only to payments to non-governmental organizations. Although such assistance might constitute a "form of assistance, however provided" to *PA/PLO*, plaintiffs offer nothing to establish that link.

Finally, nothing in the papers before us suggests that if granted an opportunity for discovery on remand plaintiffs would be able, in spite of the government's denial, to unearth

sources of funding that continue to flow to the PA/PLO post-January 31, 2019, and come within § 4.

*Benefiting from a waiver or suspension and maintaining or establishing an office, headquarters, etc.; § 4(e)(1)(B).* Subsection (B) sets out two necessary but individually insufficient conditions for deeming a defendant to have consented to personal jurisdiction. (1) The defendant must maintain or establish, etc., "any office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States." (2) The defendant must be "benefiting from a waiver or suspension of section 1003."

Because the second requirement is dispositive against the plaintiffs we address the first requirement only enough to give an idea of the context within which the "waiver" is to be examined.

(1) *Activities allegedly triggering implied consent if defendant is "benefiting from a waiver or suspension of section 1003."* Plaintiffs' strongest argument centers on activities carried out by defendants under the auspices of the U.N. Permanent Observer Mission in New York. They do not dispute the Second Circuit's holding that the ATA—and, accordingly, § 1003—do not apply to defendants' U.N. Mission as such. See *Klinghoffer v. S.N.C, Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 46 (2d Cir. 1991). Rather, plaintiffs allege that various activities carried out by personnel of the Mission go beyond the legal shield afforded by the exclusion of the Mission itself.

*Klinghoffer* reasons that "only those activities not conducted in furtherance of the PLO's observer status may properly be considered as a basis of jurisdiction," 937 F.2d at 51, and offers some examples. The court mentions

"proselytizing and fundraising activities," *id*. at 52, including those of the then-Permanent Representative of the PLO Zuhdi Labib Terzi, who had "spok[en] in public and to the media in New York in support of the PLO's cause" "[e]very month or two," *id*. (quoting district court opinion). On remand, the district court found various activities to exceed the shelter accorded the U.N. Mission, including Dr. Terzi's speeches and the Mission's generation of "informational materials" and distribution of them "to those seeking information about the PLO." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 795 F. Supp. 112, 114 (S.D.N.Y. 1992). Plaintiffs here rely on rather similar promotional activities; for example, Dr. Riyad Mansour, Permanent Observer for Palestine at the U.N., gave speeches well beyond New York itself, to wit, in Orlando, Florida. See Klieman Supp. Br. 7; see also *id*. Exhibit 4.

Even if we were to assume arguendo that the line drawn by the Second Circuit in *Klinghoffer* is correct and that the activities of the U.N. Mission in fact ranged beyond that line, plaintiffs have not (as discussed below) shown that defendants have been "benefiting from a waiver or suspension," as required for an inference of consent to suit triggered by ATCA § 4(e)(1)(B).

(2) *"[B]enefiting from a waiver or suspension."* Plaintiffs do not and cannot claim an *express* waiver or suspension. The PLO shuttered its D.C. office as of October 10, 2018, after the State Department declined to extend its § 1003 waiver. See U.S. Response 5–6; see also *id*. Exhibits 3–5. And the New York U.N. Mission operates without a waiver precisely because it isn't subject to the ATA. As the government has stated, "[t]here is no waiver of section 1003 currently in effect." *Id*. at 6.

In fact it appears correct to interpret the phrase "waiver or suspension" in (B) as referring solely to an express waiver under § 1003(3), as the government assumes.

For legal authority to issue periodic waivers to the PLO, the State Department has relied on annual State Department appropriations bills. See U.S. Response, Exhibits 3–4. For example, the 2017 letter in Exhibit 3 invokes § 7041(j)(2)(B)(i) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2780 (2015), which says:

> The President may waive the provisions of section 1003 of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (Public Law 100-204) if the President determines and *certifies in writing* to the Speaker of the House of Representatives, the President pro tempore of the Senate, and the appropriate congressional committees that the Palestinians have not, after the date of enactment of this Act [either (1) taken certain steps at the U.N. or (2) taken certain actions vis-à-vis the International Criminal Court] (emphasis added).

The natural reading then, of "waiver or suspension" in § (e)(1)(B), is the sort of formal exercise of power plainly contemplated in this statute setting forth the waiver procedure.

Plaintiffs point to nothing that could either qualify as or substitute for the formal waiver or suspension evidently required. They point instead, see Klieman Supp. Br. 3, to: (1) an agency's "constructive" waiver of a deadline by accepting payments after that deadline, *Morris Commc'ns, Inc. v. FCC*, 566 F.3d 184, 189 (D.C. Cir. 2009); (2) the unremarkable truth that defendants may implicitly consent to personal jurisdiction, *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456

U.S. 694, 703–04 (1982); (3) the fact that an agency may be required to suspend enforcement efforts to collect funds after making certain findings, *Salazar v. King*, 822 F.3d 61, 78–79 (2d Cir. 2016); and (4) a statutory provision permitting the Secretary of Defense to "expressly waive[], in writing," a certain "limitation," 10 U.S.C. § 2193b(c)(3)(B). The relevance of items (1)–(3) is remote at best. As to (4), plaintiffs' statement that "Congress certainly knows how to specify 'written waivers' when it wishes, and *did not do so here*," Klieman Supp. Br. 3 (emphasis added), appears to neglect the actual language of the legal authorization to issue waivers under § 1003, namely the one quoted above, which creates legal consequences when the President "certifies in writing" that a waiver is to be issued.

Plaintiffs would equate government "failure to prosecute" allegedly excessive propaganda activities with provision of a waiver or suspension. Klieman Supp. Br. 5. But the statute permits no such equation. ATCA § 4 is triggered by a *waiver* of § 1003—not its *violation*. Thus, the predicate for making defendants' U.N. activities legally material under ATCA § 4 has not been met.

* * *

We affirm the decision of the district court in full.

*So ordered*.